IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OSCAR HAMERA, individually and on behalf of )
all similarly situated individuals, )
)
               Plaintiff, )    Case No.   24 C 11909
)
    v. )
)    Judge Robert W. Gettleman
BEST BUY CO., INC., a Minnesota corporation, )
)
               Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Oscar Hamera sued Best Buy Co., Inc. in Illinois state court on behalf of himself
and a class of individuals, alleging that they all purchased an ASUS 14" Vivobook laptop on
BestBuy.com based on the website's representation that the laptop had a CPU base clock
frequency (that is, a CPU speed) of 3.3 gigahertz, only to later discover that it was in fact just 1.2
gigahertz. He thus asserted a claim for violations of Illinois state consumer protection laws, for
breach of express warranty, for common law fraud, and for unjust enrichment. BestBuy.com,
LLC—asserting that plaintiff incorrectly named the wrong corporate defendant—thereafter
removed the case to this court under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

BestBuy.com, LLC, on behalf of Best Buy Co., Inc. (collectively, "Best Buy"), now
moves to compel arbitration and to stay the case pending arbitration. According to Best Buy,
"[a]s part of [BestBuy.com's online] check-out process," plaintiff "agreed to Best Buy's Terms
and Conditions . . . by clicking a 'Place Your Order' button located directly under the phrase 'By
placing your order, you agree to our BestBuy.com Terms and Conditions.'" And those terms
and conditions, Best Buy contends, "included a mandatory arbitration provision and a class
action waiver." Plaintiff opposes the motion, arguing that Best Buy has not met its burden to

show that there is an enforceable arbitration agreement.   For the following reasons, the court grants Best Buy's motion.

## DISCUSSION

The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   9 U.S.C. § 2.   The FAA thus "reflect[s] both a 'liberal federal policy favoring arbitration,' . . . and the 'fundamental principle that arbitration is a matter of contract.'"   AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citations omitted). Under the FAA, a party seeking to compel arbitration "must show three elements: (1) an enforceable written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate."   Wallrich v. Samsung Elecs. Am., Inc., 106 F.4th 609, 617-18 (7th Cir. 2024).

Although "the FAA does not provide the evidentiary standard applicable for determining whether to compel arbitration," the Seventh Circuit has "analogized the standard needed to that required at summary judgment."   Id. at 618.   To that end, "[t]he party seeking to compel arbitration bears the initial burden to show that an arbitration agreement exists."   Id.   If it does so, the party resisting arbitration bears the burden of identifying a triable issue of fact on the existence of the purported arbitration agreement.   See Tinder v. Pinkerton Sec., 305 F.3d 728, 735 (7th Cir. 2002).   When there are "no factual disputes," the district court decides the issue of whether an arbitration agreement exists "as a matter of law."   Domer v. Menard, Inc., 116 F.4th 686, 694 (7th Cir. 2024); Scheurer v. Fromm Fam. Foods LLC, 863 F.3d 748, 751 (7th Cir.

2017) ("[a]rbitrability of a dispute is often a question of law that does not depend on undisputed facts").

### Existence of an Enforceable Written Agreement to Arbitrate

The issue of whether an arbitration agreement exists "is governed by state-law principles of contract formation." Domer, 116 F.4th at 694. But because that issue "calls for the application of general rules of contract formation," "the choice of law is not likely to affect the outcome." Id. Given this, Best Buy says here that "[t]o simplify the choice of law issues and for the purposes of this motion only," it has applied Illinois law in arguing that there is an enforceable agreement to arbitrate. For his part, plaintiff does not mention choice of law or dispute that Illinois law applies. The court therefore assumes for purposes of this motion that Illinois law applies. See Johnson v. Uber Techs., Inc., No. 16 C 5468, 2017 WL 1155384, at *1 (N.D. Ill. Mar. 13, 2017) (when "the parties do not contend there is a difference between two states' laws, a court need not perform a choice-of-law analysis" and will apply "the law of the forum state").

In Illinois—as "in virtually all jurisdictions"—contract formation "requires mutual assent." Sgouros v. TransUnion Corp., 817 F.3d 1029, 1034 (7th Cir. 2016). As applied in the internet age, "Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement." Id. at 1036. "One way" that a website can do that is by using "clickwrap" agreements. Domer, 116 F.4th at 694. A website, for example, "might be able to bind users to a service agreement by placing the agreement, or a scroll box containing the agreement, or a clearly labeled hyperlink to the agreement, next to an 'I Accept' button that unambiguously pertains to that agreement."

3

Sgouros, 817 F.3d at 1036.   On the other hand, a website generally will not have provided reasonable notice if it uses "browsewrap" agreements—"which provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions." Domer, 116 F.4th at 694-95.   Indeed, "[b]rowsewrap agreements typically are not enforced." Id. at 695.

"[F]all[ing] somewhere in between these two forms of agreement" are websites that "rely on simply displaying, somewhere on a webpage, a notice of deemed acquiescence and a link to the putative terms."   Id. (cleaned up).   In that situation, "purported assent is largely passive." Id. (citation omitted).   "And when assent is passive, a court will recognize an enforceable contract only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."   Id. (cleaned up).   Although these two parts "may involve underlying facts, they are questions of law" that require "a fact-intensive legal analysis."   Id.   Because there is no evidence here that plaintiff "click[ed] a button saying 'I accept' to form the arbitration agreement," the parties agree here that Best Buy "must satisfy" this two-part test.   Id.

Best Buy argues in its opening brief that it has done just that.   According to Best Buy: when plaintiff made his purchase, he had to click a "Place Your Order" button on Best Buy's website; that button had blue text directly above it with a hyperlink to the "BestBuy.com Terms and Conditions"; when that hyperlink was clicked, the then-current terms and conditions were displayed in full; and those terms and conditions notified plaintiff in all caps that they included an arbitration provision.   Best Buy contends that the Best Buy "terms and conditions hyperlink

4

is far more reasonably conspicuous" than the "Menards.com checkout page" that the Seventh Circuit recently upheld in Domer—the case Best Buy argues governs here.   And, Best Buy continues, district courts in other circuits have in fact approved Best Buy's hyperlink as meeting the "reasonably conspicuousness notice" test.   (Citing Karim v. Best Buy Co., No. 22-CV-04909-JST, 2023 WL 3801909, at *2 (N.D. Cal. June 2, 2023) and Rodriguez v. Best Buy Co., No. 823CV01194DOCKESX, 2023 WL 8946206, at *3 (C.D. Cal. Nov. 14, 2023)).   As for assent, Best Buy contends that Domer makes clear that when plaintiff clicked the "Place Your Order" button he consented to the arbitration terms.   Best Buy thus concludes that there is an enforceable arbitration agreement here.

Plaintiff responds first with a threshold evidentiary argument—that the court need not even reach Domer's two-part test because the screenshot of the Best Buy checkout webpage that defendant relies on is "not admissible."   Plaintiff then further argues that even if the screenshot were admissible, the Best Buy checkout webpage would fail the Domer test anyway.   The court addresses each argument in turn.

### Authenticity of the Screenshot

In its opening brief, Best Buy provided a declaration from Christine Olson—"Product Management, Senior Director for Best Buy"—that purported to include an excerpt of the Best Buy checkout page as it looked on August 13, 2024 (the day plaintiff allegedly purchased his laptop), showing the "Place Your Order" button and the disclosure and hyperlink to the terms and conditions directly above it.   Plaintiff thereafter moved for leave to conduct limited discovery before filing its opposition brief, based on the fact that Olson's excerpt failed to show the entire checkout page.   In response to that motion, Best Buy provided a second Olson

declaration that attached a screenshot that she says was "recreated from Best Buy's system of record" and "that shows the layout of the full BestBuy.com checkout page that would have been presented to [plaintiff] on August 13, 2024, when he made his online purchase." After the court granted limited discovery, plaintiff took Olson's deposition.

Plaintiff now argues in his response to the motion to compel arbitration that the second screen shot is inadmissible "either as a business record or pursuant to Olson's personal knowledge." According to plaintiff, based on Olson deposition testimony: Olson "could not say who specifically created the screenshot" (only that "she requested the screenshot from the 'engineering team'"); "did not know what the settings were on whatever computer was used to record the screenshot"; and "described the screenshot as just 'a mock-up of what the design *could* have looked like.'" (Quoting Olson's Dep. Tr. (emphasis added by plaintiff)). The screenshot is thus "inadmissible as a business record because Ms. Olson has no 'personal knowledge of the procedures used to create' it." (Quoting IA Collaborative, LLC v. Fathom Loop, LLC, No. 22-cv-5237, 2024 WL 2938856, at *3 (N.D. Ill. June 11, 2024)). Her testimony, plaintiff further asserts, also shows "a lack of independent personal knowledge" of how Best Buy's "webpages would have appeared to Plaintiff in August 2024." Because Best Buy failed to provide "competent evidence," plaintiff argues that the court can deny Best Buy's motion for that reason alone.

In reply, Best Buy argues that Olson properly authenticated the screenshot under Fed. R. Evid. 901. According to Best Buy, "[a]ll that is required" to meet Rule 901 "is the testimony of a witness with personal knowledge of what would have appeared on the user's screen at the relevant time." (Citing Fischer v. Instant Checkmate LLC, No. 19 C 4892, 2021 WL 3033586,

*1–2 (N.D. Ill. July 19, 2021)).   And here, Best Buy argues, Olson satisfied that requirement because she "has been responsible for the appearance of Best Buy's checkout page (including the 'Place Your Order' button) since April 2024," and "she confirmed in her declarations and again in her deposition that the screenshot accurately reflected what [plaintiff] would have seen" when he made his purchase on August 13, 2024.   Best Buy further asserts that plaintiff's argument fails because it relies on plucking statements from Olson's deposition that are taken out of context, that are irrelevant, and that cannot change the fact that she properly authenticated the screenshot.

As an initial matter, the court notes that Best Buy needlessly complicated this matter by failing to include in its opening brief a screenshot of its entire checkout page.   As will be discussed further below, Domer (which again, Best Buy says controls here) requires the court to review the entire checkout page—not just a snippet of it.   By not including the entire page—and by carefully arguing that the snippet of the "terms and conditions hyperlink is far more reasonably conspicuous" than the "Menards.com checkout page" in Domer (emphasis added)— the court can conclude only that Best Buy was attempting to avoid potential issues with Domer's test.   In any event, because the court allowed plaintiff to take limited discovery, Best Buy was allowed to provide a screenshot of the entire Best Buy checkout page.

The court finds that Best Buy has also adequately authenticated that screenshot.   "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).   "Authentication can be established in a variety of ways, including by '[t]estimony of [a] witness with knowledge . . . that a matter is what it is claimed to be[,]' Rule

901(b)(1)." United States v. Dumeisi, 424 F.3d 566, 574 (7th Cir. 2005) (alterations in

original). As applied to webpage screenshots, courts have found adequate authentication when a

party provides a witness with personal knowledge who represents that the screenshot shows what

would have appeared on the user's screen at the relevant time. See Lloyd v. Retail Equation,

Inc., No. CV 21-17057, 2022 WL 18024204, at *2 & 8 (D.N.J. Dec. 29, 2022) (collecting cases)

(finding that webpage screenshots of "checkout flow" process had been properly authenticated

by declaration on personal knowledge of the "Vice President, Digital Experience and Site

Operations" who stated that the screenshots showed the checkout flow process "as it would have

appeared" to the plaintiff); cf. Conyers v. City of Chi., 10 F.4th 704, 713 (7th Cir. 2021) (city

adequately authenticated a webpage screenshot through the department head, "who had personal

knowledge of the information on the website," who testified that he reviewed the screenshot, and

who confirmed that the screenshot was "an accurate representation of the CPD website").

That is precisely what Best Buy has provided here. Olson has testified: that her job title

is "Product Management, Senior Director for Best Buy"; that she leads Best Buy's Digital

Commerce product teams and has been responsible for approving all meaningful changes to the

features on Best Buy's checkout page since April 2024; that she asked Best Buy's engineering

team to create a mock-up of the checkout page as it appeared on August 13, 2024; and that the

screenshot reflected what plaintiff would have seen on August 13, 2024. At the same time,

plaintiff does not deny—or rely on any independent evidence to call into question—the accuracy

of the screenshot. See Lloyd, No. 2022 WL 18024204, at *8 ("Lloyd has not produced any

affidavits denying that the 'checkout flow' process appeared as depicted in the dated screenshots

introduced by the Kobelski declaration."). True, plaintiff does provide a declaration in which he

8

states: "When I finalized my purchase on the bestbuy.com checkout page, I did not see any prompt or disclosure stating that completing my purchase would subject me to any terms or conditions . . . ." But he has not argued that this statement provides evidence showing that the checkout page in fact appeared differently than as depicted in the screenshot that Olson provided.

"Because courts regularly rely on the type of evidence" that Best Buy has provided here, "and in the absence of any affidavit or other evidence contradicting that the screenshot[ ] reflect[s]" how Best Buy's checkout page "would have appeared on the date[ ] of purchase, [plaintiff]'s challenge . . . is speculation" and provides the court no basis for denying the screenshot's authenticity. Id.; cf. Conyers, 10 F.4th at 712 (noting that "plaintiffs pointed to nothing but speculation to undermine" the city's showing that the webpage was active for the entirety of the class period).

Domer's Analysis Under the Two-Part Test

With authenticity decided, the court moves to the parties' dispute over the Domer two-part "reasonably conspicuous notice"-and-"assent" test. In Domer, the Seventh Circuit invoked that test in reviewing a district court's decision to grant a motion to compel arbitration. 116 F.4th at 691 & 695. In doing so, the court explained that the plaintiff there, Domer, had visited the website of Menards (a home improvement retail company) to purchase a paint can. Id. at 691. When she was ready to do so, "the website presented her with the following final page in the online checkout process," id.[1]:

---

[1] The court has used an excerpt of the version of the screenshot from the district court's opinion, Domer v. Menard, Inc., 684 F. Supp. 3d 871 (W.D. Wis. 2023), because it is less blurry than the version from the Seventh Circuit opinion.

9



As can be seen, the website had a "Submit Order" button in blue on the right, and a "**Please note**" comment in bold on the bottom left that ended with: "By submitting your order you accept our Terms of Order."   And below the comment is a hyperlink in green coloring that was titled "Terms of Order Information."   When clicked, the link opened a text box with Menards' Terms of Order, which contained an arbitration clause.   Id. at 692.   After making her purchase, Domer, like plaintiff here, filed a class action alleging that Menards violated deceptive trade practice laws.   Id. at 693.   In response, Menards, like Best Buy here, moved to compel arbitration under the FAA, arguing that "Domer entered into an enforceable arbitration agreement by accepting the Menards Terms of Order when she completed her online purchase,"

10

and that her claims fell within the scope of the agreement. Id. The district court agreed and granted the motion. Id. The Seventh Circuit affirmed. Id. at 691.

In doing so, the court began by analyzing whether Menards' website met the first "reasonably conspicuous notice" prong of the test. Id. at 695. The court explained that courts "examine notice from the perspective of a reasonable online shopper—that is, a person who is neither an expert nor a novice with technology," and who is assumed to have "familiarity with commercial websites, hyperlinks, and online contracts"—and courts "consider five elements: (1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal relationship to the user's action." Id. "No single factor," the court explained, "is dispositive." Id. Rather, "the question is whether the website provided reasonable notice 'in light of the whole webpage.'" Id. (citation omitted).

As for the simplicity of the screen, the court explained that this factor looks at "the simplicity of the information on the screen and the way that information is presented." Id. Although the Menards checkout page had several different "fields"—including one for an order summary that listed costs with a submit-the-order button, and one for "an option to receive text updates on the status of the order"—the court found that it was "streamlined, well-spaced, and internally consistent." Id. at 696. In so finding, the court distinguished Menards' website from Amazon's website in the Second Circuit case, Nicosia v. Amazon.com, Inc., 834 F.3d 220 (2d Cir. 2016). Id. An excerpt of the website that the Nicosia court attached as an addendum to its opinion appears as follows, Nicosia, 834 F.3d at 241:

11



The Domer court explained that Amazon's webpage in Nicosia used "many different fonts" and "six colors," presented "multiple buttons and promotional advertisements," showed "various categories of transaction-related information" like the "customers' personal address, credit card information, shipping options, and purchase summary," and "between fifteen and twenty-five links." Domer, 116 F.4th at 696 (quoting Nicosia, 834 F.3d at 236-38). By contrast, the Domer court noted, the Menards webpage had "ample white space," text and images that were "pertinent to the checkout process," "a few neat boxes and columns," "consistent color

12

and typeface, and only a few items" that were "in bold type." Id. Menards' page was also "not littered with dozens (or even a handful) of hyperlinks." Id. The court thus held that the "district court correctly found that the Terms of Order were reasonably conspicuous in this uncluttered presentation." Id.

Regarding clarity, the court stated that when a website's terms "must be brought up" with a hyperlink, "a clear prompt directing the user to read them is required." Id. (cleaned up). "That usually means a statement prominently offset from other text—one that is 'bold, capitalized, or conspicuous in light of the whole webpage.'" Id. (citation omitted). Simply stated, "the fact that a hyperlink is present must be readily apparent." Id. (citation omitted). As for the Menards checkout page, the court explained that "a reasonable internet user would have seen the bold font stating '**Please note**' against the clean, white background and would have been on notice to read" to the end, where the website stated: "By submitting your order you accept our Terms of Order." Id. at 697. The court found that this "prompt and the disclosure" were not "inconspicuous or misleading." Id. It thus found that the clarity factor supported conspicuousness. Id.

So too, the court held, did the factor related to the font of the disclosure and the hyperlinks. Id. at 697-98. According to the court: the "hyperlinks to the Terms of Order are offset from the white background in a bright, green color, which . . . contrasts with the black text of the disclosure immediately above it"; the font of the disclosure "was the same as much of the surrounding text"; "[t]he disclosure begins with the bolded '**Please note**', drawing the customer's attention"; and the disclosure was placed "alone below the 'Billing & Credit Card Information,' where a customer is likely to see it." Id.

13

As to spatial placement, the court noted that the "[t]ext advising users of terms should be spatially coupled with the act deemed to manifest assent to those terms." Id. at 698. In finding that this factor weighed in favor of affirming the district court, the court explained that although the notice was not spatially coupled directly to the "Submit Order" button, it was "flagged with bolded text, a similar size to other text on the screen, and placed next to credit card and shipping information that a user is likely to review prior to submitting their order." Id. at 698-99.

And as for the temporal relationship, finally, the court noted that Menards' disclosure was "temporally connected to the required act of the user—in other words, the user encounters the disclosure on the same page where the order will be placed." Id. at 699. It was thus "easy for the user to connect the disclosure with the required activity." Id. This factor accordingly also weighed in favor of notice. Id.

Summing up the five factors, the court found that "the Menards checkout page is not a visually bewildering screen," and that "the website provided reasonably conspicuous notice of the terms to which the consumer, Domer, will be bound." Id.

As to the second "assent" part of the two-part test, the court held that, because "the Menards notice was reasonably conspicuous, . . . Domer manifested her assent to accept the Terms of Order by going through with the purchase." Id. The court therefore held that "the arbitration agreement was formed when Domer submitted her order." Id. at 700.

<u>Applying Domer's Two-Part Test to the Best Buy Website</u>

With <u>Domer</u>'s analysis in mind, the court turns to analyzing the Best Buy checkout page under the two-part test.

14

"Reasonably conspicuous notice"

Below is a table showing the Best Buy checkout page (on the left) and the Menards and

Amazon checkout pages that were at issue in Domer and Nicosia (on the right):



Simplicity of the screen.   Plaintiff argues that this factor "weighs heavily against a finding of conspicuous notice."   That is because, plaintiff contends, the Best Buy webpage is "far closer" to the Amazon webpage at issue in Nicosia than to the Menards webpage in Domer. According to plaintiff, like the Amazon checkout page, the Best Buy checkout page "features multiple different font sizes and colors," "numerous buttons and boxes relating to pickup options and payment information, extraneous notices concerning free gifts, boxes for opting-in to text updates, . . . a lengthy order summary," and "no less than *twenty-five* separate hyperlinks." (Emphasis by plaintiff).   Best Buy responds that "[p]age 'clutter' is irrelevant here because Best Buy placed its notice and hyperlink in bright blue font immediately above the 'Place Your Order' button."   So, it argues, "[a] reasonable consumer . . . did not have to search the page to find it, and the notice could not be obscured by any alleged distracting 'clutter.'"

The court finds that this factor is neutral.   As an initial matter, the court disagrees with defendant's suggestion that page-clutter is "irrelevant here" simply because Best Buy places the "notice and hyperlink" directly next to each other.   Indeed, plaintiff cites no Seventh Circuit precedent for that proposition.   And accepting it would require the court to essentially ignore both this first Domer factor—"the simplicity of the screen," 116 F.4th at 695 (emphasis added)— and the Domer court's mandate to analyze "the website . . . 'in light of the whole webpage,'" id. (emphasis added).   It would also essentially render "dispositive" the fourth factor—"the spatial placement of the hyperlink"—even though the Domer court made clear that "[n]o single factor is dispositive."   Id.   Simply stated, "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."   Nicosia, 834 F.3d at 237 (cleaned up).

16

Turning back to the simplicity of Best Buy's screen, the court finds that the Best Buy checkout page is not quite as "streamlined" and "well-spaced" as the Menards checkout page. Domer, 116 F.4th at 696. But neither is it as cluttered and distracting as the Amazon page, which was crammed with many colors, fonts, and call outs. And, as the Domer court pointed out, the Second Circuit in Nicosia did not hold that the Amazon page precluded "'objective manifestation of mutual assent . . . as a matter of law,'" but instead "concluded 'simply that reasonable minds could disagree on the reasonableness of notice.'" Id. (quoting Nicosia, 834 F.3d at 238). Because reasonable minds could similarly disagree over which way this simplicity factor cuts in this case, the court finds that it is neutral.

Clarity of the disclosure and size and coloring of the disclosure's font. Plaintiff analyzes these two factors together and argues that they weigh against conspicuousness because the prompt above the "Place Your Order" button "is not bolded or capitalized and is in the smallest font size of any text on the webpage, making it easy to miss." Best Buy responds that plaintiff "cites no authority that requires bolded or capitalized text, and even a cursory glance at the page confirms that his assertion is untrue"—"[t]he font is the same size as other text on the page, is located directly above the 'Place Your Order' button, and the links are offset in a conspicuous bright blue font, known for being hyperlinks."

The court finds that these factors are neutral or slightly favor conspicuousness. On the one hand, like the Menards page, the Best Buy page uses the same "by [submitting/placing] your order you [agree/accept]" language that should reasonably prompt users to read the terms and conditions. Domer, 116 F.4th at 697 ("Courts have compelled arbitration based on similar prompts."). The hyperlink is also in the "typical blue" font that would alert a reasonable user to

17

the existence of a hyperlink, is set against a white background, and is located within the disclosure itself—which is a short, single sentence.   Id. (cleaned up).   The disclosure is also in the same final text box that starts with a bolded "**Important**" that would naturally "draw[ ] the customer's attention."   Id. at 698.   And it sits right above the bright-yellow colored "**Place Your Order**" button, which would also "draw[ ] the user's eye."   Id.

On the other hand, the disclosure and hyperlink text is smaller than the surrounding text—the "**Important**" text, the "return restriction" text, and the "**Place Your Order**" text. And while the "**Important**" text is similar to Menards' "**Please note**" text, it is immediately followed by the phrase "**Return Information**" in bold—which could lead a user away from thinking that any general terms and conditions are to follow.   Overall, the court finds that these factors are neutral or weigh slightly in favor of conspicuousness.

Spatial placement of the hyperlink.   Plaintiff asserts that this factor weighs against conspicuousness because the link is placed "between the 'Opt-In For Text Updates' option and the 'Place Your Order' button."   He concludes that "the placement of the disclosure adjacent to a clickable box allowing customers to *affirmatively* agree to receive text messages would distract a reasonable consumer and prevent them from understanding that pressing the 'Place Your Order' would bind them to anything."   (Emphasis by plaintiff).   Best Buy maintains that the "notice and hyperlink" are placed "in bright blue font **immediately above** the 'Place Your Order' button," such that a "reasonable consumer" would "not have to search the page to find it." (Emphasis by defendant).

The court finds that this factor weighs strongly in favor of conspicuousness.   Domer counsels that the "[t]ext advising users of terms should be spatially coupled with the act deemed

to manifest assent to those terms." 116 F.4th at 698. That is exactly how Best Buy's website is configured: the disclosure and link are directly "next" to the order button such that "a user is likely to review [it] prior to submitting their order." Id. at 699.

The court, moreover, is unpersuaded by plaintiff's assertion that Best Buy's placement of the "Opt-In For Text Updates" checkbox option near the link "prevent[s] [customers] from understanding that pressing the 'Place Your Order' would bind them to anything." Plaintiff provides no legal support for that notion. And indeed, the Domer court was apparently similarly untroubled by Menards' placement of an "option to receive text updates on the status of the order" checkbox above the disclosure on Menards' page. 116 F.4th at 696. The court thus finds that the "spatial placement of the hyperlink" factor weighs strongly in favor of conspicuousness.

Temporal relationship to the user's action. Plaintiff concedes that defendant's "screenshot shows a disclosure on the final bestbuy.com checkout page." But it argues that "the analysis [of this factor] is complicated by the fact that a similar disclosure appears earlier in the checkout process." In particular, according to plaintiff, the below page appears earlier on the Best Buy website and includes a "sign-in box for returning customers" that has a link to the terms and conditions:



Plaintiff argues that, by including the link only for returning customers, Best Buy "actively misled guest purchasers," like plaintiff, because a guest would "have no reason to expect that some subsequent disclosure in the checkout process would bind them." Plaintiff concludes that, although <u>Domer</u> did not "address such a scenario," the Seventh Circuit has denied motions to compel arbitration after determining that a website actively misled the customers. (Citing <u>Sgouros</u>). In response, Best Buy asserts that plaintiff's screenshot—which it says was taken by plaintiff's counsel—is "irrelevant and complicates nothing." (Emphasis and capitalization removed). That is because, it says, a guest ultimately ends up at the checkout page where it must click on the "Place Your Order" button to complete the purchase.

The court finds that this factor weighs in favor of conspicuousness. The fact is, a user "encounters the [Best Buy] disclosure on the same page where the order will be placed," such that it is "easy for the user to connect the disclosure with the required activity." <u>Domer</u>, 116

F.4th at 699.   That some users may encounter on earlier pages a separate prompt and disclosure that is associated with a different action, does not change that fact.

Nor, contrary to plaintiff's contention, does it make the Best Buy website "misleading." Sgouros certainly does not support that.   Indeed, the Sgouros court addressed a different issue. As the Domer court explained in distinguishing Sgouros, 116 F.4th at 697:

> [I]n Sgouros, the bold text beneath the scroll box informed the purchaser that clicking on the box constituted his authorization for the company to obtain his personal information—it said "nothing about contractual terms."   Sgouros, 817 F.3d at 1035 (explaining the web pages "contained no clear statement that his purchase was subject to *any* terms and conditions of sale["]).   So, the court held that the company "actively misle[d]" the customer.   Id.   "No reasonable person" would have thought that authorizing a company to retrieve personal information would form a contract binding him to arbitration.   Id.

Here, by contrast, the court cannot similarly say that "no reasonable person" would have thought it conceivable that he would end up encountering another prompt and disclosure before purchasing the product.   Best Buy thus did not "actively mislead" guest users.   The "temporal" factor accordingly also weighs in favor of conspicuousness.

In sum, the court finds that the simplicity of Best Buy's screen is neutral; that the clarity, size, and coloring of the disclosure is neutral or slightly favors conspicuousness; that the spatial placement of the hyperlink strongly favors conspicuousness; and that the temporal relationship to the user's action favors conspicuousness.   Overall, then, the court finds that Best Buy's "website provided reasonably conspicuous notice of the terms to which the consumer, [plaintiff], will be bound."   Domer, 116 F.4th at 699.   In so finding, the court notes that it has landed in the same place as several other district courts in other circuits that have analyzed Best Buy's website.   See Jordan v. Best Buy Co., No. 24-cv-1066, 2025 WL 580894, at *4 (D. Minn. Feb. 21, 2025) ("find[ing] that the Terms at issue were reasonably conspicuous," noting that they "appear

21

directly above the Place Your Order button, in plainly readable text, with a hyperlink in blue to stand out"); Rodriguez, 2023 WL 8946206, at *3 (finding that "Best Buy's website gave Plaintiff reasonably conspicuous notice of the arbitration agreements"); Karim, 2023 WL 3801909, at *5 ("conclud[ing] that the Best Buy webpage provided reasonably conspicuous notice of the T&C").

Assent to the Terms and Conditions

As noted above, plaintiff "denies seeing or reviewing" the hyperlink above the "Place Your Order" button "when he completed his purchase, and thus denies that he agreed to the Best Buy Terms and Conditions." But that is irrelevant because passive assent is determined "from the perspective of a reasonable online shopper." Domer, 116 F.4th at 695. And in fact, as the district court in Domer noted, "Domer [herself] did not see the notice or the Terms of Order Information hyperlink when she went to complete her purchase." Domer v. Menard, Inc., 684 F. Supp. 3d 871, 875 (W.D. Wis. 2023). Because Best Buy's "notice was reasonably conspicuous"—and expressly stated that clicking the "Place Your Order" button constituted an agreement—plaintiff "manifested h[is] assent to accept the [BestBuy.com] Terms [and Conditions] by going through with the purchase." Domer, 116 F.4th at 699. The court consequently finds that "the arbitration agreement was formed when [plaintiff] submitted h[is] order." Id. at 700.

**The Scope of the Arbitration Agreement and Refusal to Arbitrate**

As explained above, the second and third factors in determining whether to compel arbitration are: "(2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate." Wallrich, 106 F.4th at 618. Plaintiff does not dispute that if there is an enforceable

22

arbitration agreement, these factors are met here. He has thus waived any argument otherwise. Cf. Yang v. Fedex Freight, Inc., No. 15 CV 1037, 2016 WL 3444219, at *6 (N.D. Ill. June 23, 2016) ("Because a failure to respond to an argument constitutes waiver, summary judgment is granted in defendants' favor on those claims."); see also Nichols v. Michigan City Plant Plan. Dep't, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

It would fail, anyway. As to scope, "[o]nce the court finds that there is a valid agreement to arbitrate, the burden shifts to the party opposing arbitration to show that the dispute is not covered by the agreement." Wilcosky v. Amazon.com, Inc., 517 F. Supp. 3d 751, 767 (N.D. Ill. 2021). Again, plaintiff has not argued this issue at all—let alone met its burden. For its part, Best Buy argues that the applicable terms and conditions that Best Buy attaches to its motion include an arbitration clause that incorporates the rules of the American Arbitration Association (AAA). "[T]he 'consensus view' in this district accords with the consensus among the federal courts of appeals: incorporating the AAA's rules, or similar rules, into a contract clearly and unmistakably delegates arbitrability to the arbitrator." Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A., 553 F. Supp. 3d 452, 458 (N.D. Ill. 2021); see also Wilcosky, 517 F. Supp. 3d at 768 ("the consensus view of federal case law is that the incorporation by reference of the AAA Rules is clear and unmistakable evidence of an intention to arbitrate arbitrability"). "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Wallrich, 106 F.4th at 620 (citation omitted). The issue of the scope of the arbitration agreement is thus for the arbitrator to decide. This second element is therefore met.

23

As to plaintiff's refusal to arbitrate, plaintiff has refused to arbitrate "given [his] initiation of the current lawsuit." Ass'n of Flight Attendants-CWA, AFL-CIO v. Am. Eagle Airlines, Inc., No. 05 C 2009, 2005 WL 2335488, at *4 (N.D. Ill. Sept. 19, 2005); see also Carter v. CVS Pharmacy, No. 19-CV-06296, 2021 WL 1172260, at *2 (N.D. Ill. Mar. 29, 2021) ("The third element, Carter's refusal to arbitrate, is clearly present as well, since Carter brought this case in federal district court and opposes arbitration."). The third factor is accordingly also met.

In short, the court finds that all three relevant factors here support granting Best Buy's motion to compel arbitration. The court therefore grants Best Buy's motion to compel arbitration.

The court also grants Best Buy's motion to stay the case pending arbitration. Plaintiff does not dispute that a stay is appropriate in this circumstance. He has thus waived the issue. Cf. Yang, 2016 WL 3444219, at *6; see also Nichols, 755 F.3d at 600. At any rate, a stay is appropriate here: "the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss." Halim v. Great Gatsby's Auction Gallery, Inc., 516 F.3d 557, 561 (7th Cir. 2008) (citation omitted). Indeed, that course of action aligns with "Section 3 of the FAA, which directs courts to stay proceedings that have been referred to arbitration until arbitration has been completed." 20/20 Foresight, Inc. v. McGuffin, No. 20 C 6915, 2021 WL 619718, at *3 (N.D. Ill. Feb. 17, 2021) (staying case pending arbitration).

## CONCLUSION

For the above reasons, the court grants Best Buy's motion to compel arbitration and to stay this case [Doc. 10]. This case is stayed until further order. The parties are directed to

24

inform the court when the arbitration is completed.

So ordered.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:** **July 2, 2025**